My name is Bill Peterson. I'm a lawyer for the law firm of Snell & Wilbur, and I represent an appellate and a cross-appellate in this case, Sherrop Center Power Company. Three weeks ago, three weeks now, basically, from today, there was a huge flood on the Truckee River, but in your flood, it destroyed the ferry dam, and we're still mitigating that case today. Yeah, I have sort of a basic question here, and that is whether the parties have made any use of a mediation unit. This is a case all about money, and, you know, not a prison term or anything like that. Is that something that would be beneficial? The thing about your honor, and the reason I say that is, as you know, this is the second time this case has been on the Senate circuit. The first time, probably, not coincidentally, the same question was posed. I was going to answer it differently the first time. And, in fact, the case was adjourned, or we did go back to mediation. Okay, you don't need to tell us the details. It sounds like it's fair enough if the parties are not interested. Basically, as I understand it, there are two choices. You can either rebuild the dam and get full coverage, or you can decide not to rebuild and get the cash value, and you can elect to maintain those. Is that a correct understanding of the two options? I would agree with you a hundred percent. I'm not sure that the carriers would agree, and I think that's part of their cross-examination. That's your position? That's correct. This was brought up at the end of my appeal at counsel. Yeah, but you're certainly not seeking to change what you think the district ordinance has. No. That's just what Judge Draper said. I'm not. So, the only thing you're It is the depreciation finding, Your Honor, and then it slightly alludes to the cross-appeal because the judge in this case, he corrected it. So, whether he's wrong or right or wrong, you're not seeking to change what the text is. No, I only raised it because he corrected it after I filed my notice of appeal, but under Rule 162, he can do that. So, let's just focus on depreciation for a second. Yes, very good. There was testimony by the insurance adjuster that he had applied a 50% rate of depreciation to dam at 5% in West Point. Yes. Wait a moment. I'm sorry. I think it was on the West End. It was. It was on the West End. I don't know. I don't know. I don't care. It was on 50% and 5% he testified to. He also testified that your clients agreed to it. The first appeal, I think, suggests there's no evidence of an agreement. Only apart from the agreement, there was testimony in the record unobjecting to and trial by this adjuster that there was a 50% depreciation rate and a 5% rate. Wasn't that enough evidence for the judge to make his mind up? You know what, I just think he hit the nail on the head. That's the second time I've done it this morning. I want to make sure I hold the five minutes that everybody's got. It's like you put it in the language that I understand best. I think what you're saying is that there's substantial evidence. Isn't that testimony substantial evidence? It ain't much, but it's something. Yeah, it ain't much, but it's something. Okay. Well, there's two things about that. One is that very evidence was addressed by the previous panel. That's why I phrased my question that way. The previous panel said, no, there was no agreement. Well, I'm not sure they did. That's why I need your help. I think the previous panel said differently. You said there was an agreement with respect to ACV. The first time through the insurers, you said there was an agreement as to ACV. Yes. That's wrong. There was no agreement. Right. Only apart from whether there was an agreement did Mr. Jeremy testify that he calculated a 50% depreciation rating, 5% for the weight, and they agreed to it. So cut off the part that says that they agreed to it. What did the first file say? First, the PLC with respect to ACV. It says two things. But before I begin, I want to disabuse you of the fact that there was no calculation. There was no calculation. Why should climate adjusters look at a bunch of stuff? I know. I know. I said it was very thin, but he did use the word calculation. Okay. But back to my first point. The Ninth Circuit, the previous panel said two things about this, and they addressed that very point, and you are correct. They said Judge Hicks is wrong in concluding that there was an agreement. In fact, Judge Hicks also said there wasn't an agreement. But they did address that very piece of evidence. They addressed two pieces of evidence in the previous panel. One was the alleged agreement, and the second was the email about the 50% depreciation. And what the previous panel said about that evidence was that that evidence was apparently a recommendation by the broker. Right. That's the broker's. I understand his plan. Okay. All that stuff aside, nonetheless, when I look at the record of the first trial, and I start out by saying it's not a lot, but Mr. Jeremy says we calculated a rate of 50%. You just go into the foundation of it, but there's no objection. And then they agreed to it. And there's also some separate evidence about the broker sending an email about it. It's focused just on what Mr. Jeremy said. Okay. I see you're not impressed with my first argument. The point that I was trying to make was I believe the point you already made, which was thin as it may be, don't forget it has to be substantial evidence, which is evidence upon which a reasonable person could come to a conclusion. And whether that is or is not, I don't believe that it is. And secondly, and this may be more important than your point, and that is it doesn't really matter what they say because the rate, not the rate, but the depreciation methodology and the amount is not a question of fact. The methodology is a question of law. And so it would be wrong for the judge to say, I find this to be substantial evidence because a broker or an adjuster said, I think it's 50% when, in fact, the law says this is how you determine depreciation. That is what the judge should be doing. The methodology is he doesn't get to pick the methodology and say that the dam was rebuilt, originally built in 1890 or something. It was rebuilt, completely moved in 1960. The first one lasted about 60 years. Is that right? Yeah, I guess that's right. And we're now, we're 30 something years into the second one. Right. How should the judge have calculated the depreciation? He should have done it in the way that is laid out in the cases. In the commentary. In the recognized appraisal methodology. And there's no dispute, there's absolutely no dispute about it. When I said it, you argued there was no depreciation at all. I did. I did. The judge rejected that. Okay, so let's assume that there is some depreciation. Just tell me how he should have calculated it. I know he should have done it the right way, but just mathematically tell me how he should have done it. The math is this. The math is laid out by the nice circuit in the previous panel. Actual cash value equals fair market value. Right in the previous order. Minus depreciation. No, actual cash value equals fair market value. Fair market value equals full replacement cost minus depreciation. Yeah, so the one thing that I haven't heard discussed in your colloquy with Judge Hurwitz is, if I'm remembering it correctly, Jeremy testified that the 50% depreciation and the other numbers were not objected to. That these were agreed upon numbers. And I think that the court relied on that to a great extent. So what effect does that agreement or lack of protest at the time have on our analysis? Well, the judge gives fairly evidence because I didn't object to it. But that doesn't mean that he's entitled to rely on it. Well, no, no. It was more than that you didn't object to the evidence. The testimony itself was that there was agreement as to the numbers that were being testified to, which is not about the evidence. It's about the calculation. Well, I sort of already said that there was not an agreement. But the judge also found there was a lack of objection. Right. And he complimented that by going back to the record and saying, look, I'm not saying there was an agreement. It said, but I do think there was a lack of objection. So I agree. Okay. So I have more of Judge Greger's question. He's going to say it better than I was. Keep going. Doesn't Jerome's testimony, the calculated evidence testimony that we have this I didn't object to it, together, isn't that substantial evidence? No. No. The judge is not the judge. I'm certain all of you judges, I know the trial court judge, done condemnation cases before. It doesn't matter what the evidence comes in on a condemn. When you're valuing, your valuing is covered by the evidence. It's still in California. Valuation is the same valuation methodology used whether it's a tax case, whether it's a condemnation case, or whether it's an actual tax value case. The methodology is clear. And the judge can hear all kinds of evidence on that. But he is not free, the judge is not free to pick a different methodology than the methodology required by the law. So applying the methodology, and I'm still sure you told me how it works. I'd love to do that. Well, applying the methodology required by the law, I'm telling you what the depreciation was. I'm telling you the depreciation is nominal. I know, but the trial judge rejected that in our prior panel. He's wrong. The prior panel was wrong, too. No, no, no. The prior panel did not say that. What the prior panel said was, Mr. Peterson, you are wrong when you say that we may not deduct depreciation. And I agree, you may deduct depreciation. But the question that is posed to the trial court is, how much? That is the question. I never told the Ninth Circuit, I never told the trial judge. And you really think that it's reasonable to conclude, I mean just as an overview matter, that a 60-year-old dam has basically no depreciation? If that's the methodology. Look at it this way. Well, you were the one who said it has to be actual value, which looks at depreciation. Look at it this way. I'd like to go back really to the math, because the math lays it out very clearly. The real world is problematic when you look at a 60-year-old dam. I'll let you do this in a second, but I want to just focus on Judge Weber's question. You've got a dam that was built in 1960, I think. Yeah, for the whatever month it was, they had to move the creosote logs. Creosote logs. It's 40, how old do you think the dam is? Almost 40 years old. Older than that, 50, 60, maybe. I think she said 60. It's not 60, but it's 50. Are you talking about when the flood occurs, when it's 40 years old? Well, 34. Okay. I think it's the season. It's over. If you're under 40, you should be able to do that. Right. So do you think a dam of that age has exactly the same actual cash value to a buyer than a brand-new one? I do. Because they go on for 100 years. That's also 100 years. That's 34% depreciated. This is not some piece of equipment somebody keeps in a backyard or a construction yard. You're talking about a power plant. Say it again. I'm sorry. Can you finish your answer? Oh, she was going to say, you know, in my brief where these things go, over 100 years. This is it. They're regularly maintained. They're checked every day. They're always watched. They produce electricity every single day, which is why they're maintained in tip-top condition. The judge agreed it was in tip-top condition. But that wasn't in dispute here. I'm sorry. What evidence did you put on that there was no depreciation? The evidence I put on was also recited by the trial judge and disregarded by him. It's right in his order. What he said was, okay, so the dam was perfectly well-maintained and it's operating at full functionality, but it's worse. He says what you guys are saying right now, which is basically, okay, I agree with all that, but that still doesn't account for the age and life expectancy of the dam. So he falls back on exactly what you all are saying, and that is wrong because the age and the life expectancy of the dam are not factors you consider in depreciation analysis. It's fair market value. Did you have any evidence that you put on expert evidence of that conclusion? Your Honor, what I was arguing to the court was that the value of that dam, if you use the three appraisal methodologies, as I'm sure that you're familiar with, reproduction cost, income analysis, or comparable sales, those are the ways you do it, if you apply those factors. If you look at the evidence that was presented, that I presented for Craig Williams, this dam is in tip-top shape. It's maintained every day. It diverts water and produces 2.7 megawatts of electricity every single day. The value of that dam is precisely the same as if you had taken it out and built it with gold. If you built a gold dam, it wouldn't be worth one penny more than what it was worth in a creosote dam because it produces the same income and it has the same function of diverting water and protecting the water rights, which is why I was telling the trial judge, please use the correct methodology. Didn't you argue, and I'm trying to find your briefs here, so I'll find them later. Didn't you argue to the Ninth Circuit the previous time through that what you should recover is $19,800,000 as actual cash value? Because that's the reproduction cost of the dam. Right, so therefore you argued to the Ninth Circuit that no depreciation should be taken off of that. No, I did it earlier. You said, here's $19,800. That's the estimated reproduction cost. I should get it all. And the Ninth Circuit said in a prior appeal, no, no. Or it has to calculate depreciation. No, no, no. What the Ninth Circuit said was, Judge Hicks, the policy language says actual cash value with proper deduction for depreciation. With proper. Not only with depreciation, both it was the proper deduction for depreciation. Your argument to the Ninth Circuit was zero. Because the value of that dam is the same. It has not depreciated. In fact, the Ninth Circuit remanded, nonetheless remanded for Judge Hicks to calculate depreciation. It says a ban for determination of the actual cash value based on reducing the replacement cost of $19,800,000 by the appropriate depreciation. I only have a couple of minutes. This may put it together for you. Everybody has bought a car. I'm sure you've all bought a brand-new car. You buy that car. Let's say it's a brand-new Cadillac. You drive it off a lot. You decide six hours later, oh, you don't really like this car. You return that car. You decide to sell that car. It is in precisely the same shape as it was. You couldn't tell the difference from the unused car to the used car. That car has depreciated $5,000, $6,000, $10,000. Why? It is because you take the math, which is the same math which applies to this dam, which is what is the cost of this thing. It is the reproduction cost. Less depreciation equals fair market value. The fair market value of that Cadillac is $15,000. You paid $20,000 five hours earlier. Well, how much is it depreciated? $5,000. It's the same formula you use in every single case. Council, I think we understand your position,  that's what you might want to do. Thank you. I'm sorry to be so forceful. That's okay. Yes. We gather. It's effective. Don't worry about it. Okay. Good morning, your Honor. My name is David Blanton. I cover some futures. I take a medicine that drives me out. Feel free. We're doing the same up here. I'm David Blanton. Let me threaten a couple of things out here first. To answer the first question you asked, Judge Graber, the policy says we will pay a replacement cost. The policy then says if you don't replace within two years, we will pay actual cash value, which is measured by a replacement cost. Right. And the two years in the previous iteration of this appeal was held to be production loss. So the two years is gone. So it's like the two years is gone. There's still the two options. You can either actually rebuild it or you can get cash amount. I think phrased slightly differently. You can always rebuild it. And even if you haven't yet rebuilt it, you still get actual cash value. So it's not a choice. It's a choice to rebuild or not. So we've been arguing a lot about the first appeal here. As I read your cross-appeal briefs, you sort of seize on a misstatement that the trial judge made in the second go-round and say if they do choose to rebuild, all they get is $19,800. That's right. And the first time through, that's not what the judge held. We affirmed the judge ruling the first time through. The judge made the policy as clear. Is it not that what you get if you rebuild are the actual costs of rebuilding? Well, that's what our panel said. I respectfully disagree because Judge Wood just read what the panel said. The panel said in remand for a determination of the ACB. That's with respect to the ACB. Reduce the replacement cost of $19.8 million. I know.  That's for the ACB. Okay. Why doesn't ACB, using what I've estimated, replace the cost as a surrogate for fair market value? You can't go with the actual cost of the construction, is he? Actually, you can, Your Honor, because the policy tells you how. The policy says that you would have to determine the point at which, with due diligence and dispatch, the insurer could have replaced. I understand, but we had a previous appeal in this matter. One of the things you appealed the previous time was the argument, was their judges ruling that they could get the actual costs of reconstruction where they should be built. And your court rejected your appeal on that issue. I respectfully disagree. Well, it seems they also, the last time through, affirmed the holding that the coverage available under the policy includes the costs necessary to comply with current regulatory requirements and building codes if there is an actual replacement undertaken. And that has nothing to do with the ACB. Well, I think we're kind of off. We're off on your cross-appeal. Well, I understand you're on my cross-appeal. That's fine. What do you want me to do with my cross-appeal? Two things happen in this situation. One, the court has to make a determination as to when the property would have been rebuilt with due diligence and dispatch. The trial court would be at finding a fact. Yes, it's on the well-exerted record, page 7. Finding a fact, 26G. The trial court said the actual time necessary to rebuild and replace the Farad Dam with diligence and dispatch is three years following this court's finding of fact. You're no longer contending that they didn't do it within the appropriate time period. Right. I understand that the trial court and the appellate court ruled that we lost on that. We lost on that. So the only question is, should they choose to rebuild, which I doubt that they will. Should they choose to rebuild? Do they barely get $19,800? Or do they get whatever it actually costs to rebuild and get $19,800? That's your position. I'm asking you differently. That's the question, is it not? Isn't that the question before us? No. That's one of the questions, but the biggest question is, how is this within the mandate? How is any of this within the mandate? Well, that's my problem, see, because I think it's not within the mandate. You lost the first time. That's my view of what we did last time, too, because I understood our previous decision to say that if there's a replacement, not only do you pay the full value, you pay the full replacement cost if it's rebuilt, and even if it's bigger than it would have been because of new regulations and ordinances of fees and so forth. All those costs are already in the $19,800. That's an estimate, is it not? Your Honor. Is it not an estimate, yes or no? It was a fact at the time of the trial. That's not the question. You know, we can waste time reconstructing this, but it is an estimate. Nobody knows how much you actually cost. It was called estimated cost. Right. I'll give you an estimate. Okay, thank you. And we use that estimate because there's nobody out there buying beers. Otherwise we could find fair market value by comparable sales. So when we look at actual cash value, the trial court says, and we agreed, we said the first time through, use estimated replacement cost as a surrogate for actual cash value, and then take the depreciation off of it. That's the other part of the scenario. But we didn't consider the trial court's findings with respect to replacement, the actual reproduction cost. The actual reproduction cost of the time that is relevant, See, the problem here is. That's not what we said, though. I think it is what you said. I don't know what the trial court said. I don't know what you're yielding. The trial court made that finding a fact, 26G. We affirm the district court's finding that the coverage available under the policy includes costs necessary to comply with current regulatory requirements and building codes. That's already in the 19.1. No, that's not. The 19.8 is already dealt with from that. Anyway. Well, I will tell you as a matter of fact, under the 19.8 includes all the code regulation requirements to meet new codes. Otherwise, this was a creosote dam. It wouldn't have caused 19.8 million dollars to put back a creosote dam. This has got all the regulations in it. It's got fish ladders, so the fish can swim upstream and not get diverted by the dam. The sulfoxane in this dam needs to divert water downstream. Well, it does. Maybe we just have a different view of this, but I'm reading the trial court's findings. It's not true. SCR 8. Policies of interest provide CR 8, full replacement cost coverage subject to the sublimit of liability. And you can read it again. The judge did not find the first time through that full replacement cost coverage was 19.8. He found that the estimated cost of replacement was 19.8. Correct? Go back one page. Go back one page. Yeah. Look at twice as cheap. The actual time necessary is three years. Time to rebuild with due diligence and dispatch. And that's what the policy says. Okay, but time and amount are two different questions. The findings about time don't undermine the part that Joe is making. You'll have to focus on some specific period of time. The question is what is the actual reproduction cost at that point in time? Well, let's go to the 50%. But the point is. I can see why we should be mitigating this for 20 years. They built this dam in 2075 where it's going to cost 50 billion to replace and get the increased costs. And how long does this go on? How long do they have to do this? The point of these policies is we don't know exactly what the cost is, but they get an estimate, they present it, and they have a replacement cost. And if it actually did, I don't even know. It's hard to cast blame at this one, unfortunately, on their side. They had a bid after 2016, back in those days, and you offered a million, I'm a million too. So it's obviously wrong in our view of the policy, but it wasn't that hard. So both sides have been wrong. I'm sorry to weigh in, but it's gray. It's like my hair. All I'm suggesting is it's not all that useful to argue here. They seem to hear both sides. I agree with that. You want to talk about the 50%? I do. Let me just tell you to repeat what I said to your colleague. I have always said the first time through was that there was no agreement as to ECP, and I think that fairly can be read there. We also found that there was no agreement as to the depreciation cost. But great. Okay. So is it enough for us to find depreciation through your adjuster just to say, well, I calculated 50%, because that's really what you got. Well, here's the problem here, Larry. It's your burden, right? We do agree it's your burden to show depreciation. I will accept that for the purpose of this. How did you meet that burden? We're not having evidence that was on your burden. Patrick Jeremy, a guy who's been in this business for I don't know how many years, he testified to it. He's retired now, so I'm sure by that time he was 40, sat down with them and went through the numbers. The fact that it wasn't an agreement doesn't mean that it isn't valid. No, I understand. So I'm asking the same question that you're putting, Frank, because I've read all the testimony in the record on this. It's about this burden. Sure. The problem is that Sierra put all its eggs in the there is good appreciation for this. Right. But they had no burden. I agree with you that they lost on the no depreciation issue. Right. There's no better number of evidence. The only evidence in the record is 50% and 5%. Fair enough. We agree with each other so far. The question is, is that evidence? So it should be probing of depreciation, given the fact that it's really just the adjuster saying, well, I calculated it at 50%. Fair enough. It was uncontroverted. So it is enough. It's more than a suit till the trial court accepted it. No need to disabuse you. I need to disabuse you of one more fact, and that fact is this dam was not functional until January of 1997. In 1996, in June, the flow failed, the flow is that piece that the universe, the water into the flow, the flow changes off the side of the, of the problems or whatever is there to increase the speed. So it goes to the power and generates more power, faster than the rivers, but then the water comes back out into the river. Okay. So let's assume for a moment that you're right, that there's enough here for the judge to five to 50% and 5% rate. And all the calculations of that are just mathematical. They didn't tell me math would be involved, but it is. Okay. Why then shouldn't there be prejudgment interest on the ACV, not their actual recovery costs, actual reproduction costs, but on the ACV, the judge found as a matter of fact, it was 1980. It was 16th. I mean, when they first made their. They rounded it up. Right. They rounded it up. He only applied it. He only applied it to the, to the previous number. He only applied the prejudgment interest of the 16 million something. That was a fixed number in the insurance companies. The depreciation was a fixed number. Why shouldn't you have written a check or at least offered to pay the ACV of that amount back in 1980, 2001. So in other words, in your view of the world, this is an easily calculable number. Yet you only offered a million two. Well, the mere fact that we ended up at prepayment, there's an issue, which quite frankly, I still think is an error of what has been decided. So I can't argue that anymore. We all wish the previous panel had taken this case down. But that's. The problem is that the time to have asked for prejudgment interest was in April of 2008, but this case was currently. See, I agree with you with respect to actual reproduction costs, but what happened in 2008 is that Sierra Pacific got a negative verdict. The judge's verdict was you're entitled to one, two, one million two is ACV, but they've already paid you more than that. Oh, you're pretty good. You pay so that you get zero. Yeah, you get zero. Wait, that's right. If you take out the deductible, you get no soup. Sierra Pacific, you get zero. It's hard to fault them for not asking for prejudgment interest. Not zero. It was never planned. It was. This is a matter of law. It's a post trial issue. But, but, uh, the US Supreme Court says it's also an element of damage. Right. But you have to plead it and prove it. You know, our cases say that you raise the issue appropriately in a post trial motion, rule 50 to any motion. And with respect, I think to the extent that this, that the other side's arguing that they get prejudgment interest on whatever it has to cost to replace the payment, they choose to do that. I think they're wrong because there was a judgment first time about actual group reduction costs that they never saw the return of interest. But this time, but I, it's hard to fault them in my life for not seeking it when they get zero. Can't they wait until they see it where they get a positive reward before they seek it. But it goes all the way back to the pleadings. They never pledged a claim for breach of contract. They never pledged a claim for damages. This case was never about damages. It was for a declaration as to how much something costs. When, when the judge got it back the sending time, he decides, well, how many had a judgment in a monetary note and had a, and again, a prejudgment. Actually, the complaint the first time through sought both declaratory relief and recovery under the policies. That's the police. You ask for damages. Okay. Assume that you're wrong about the waiver argument. Tell me why there shouldn't be prejudgment interest in it. Well, if they haven't waived it, they get prejudgment interest on the ACV. Less depreciation. Um, okay. I can't come up with another argument. Okay. So it's this time, waiver is the dispositive argument. Yes. Okay. I'm sorry. Why are we taking you? Of course. They serve to rebut. Mr. Peters, who's a doubly stellar argument on the cross appeal. So if you have questions. Well, if he, if he talks about the cross appeal, you may, and if he doesn't talk about the cross appeal, you're done. So that's. Well, we have more questions on the main appeal or the cross appeal. I'm going to put you on the aggressive now. Otherwise I'll take my, my chances and assume he's going to say something. Okay. You have a real opportunity, Mr. Peters. I didn't think you'd hear it. You're going to pass it by. Let me get along with that. Mr. Glenn, I actually operate in France. Some people already know. It must be. I'm not exactly sure what I'm permitted to talk about. I want to go back to my main point, which is the math, which is as important to me. And so do you, you said something. Do the math for me. Tell me what the depreciation should be. This is not zero, which this is, this is right out of the ninth circuit. In this case, they said actual cash value equals fair market value. That's point one. He says fair market value equals reproduction costs plus depreciation, which I'm sure we've all talked about. It's great. Algebra to our kids or grandkids. What you do is you do the equation. And if you do the equation, you know, you move the D over the minus sign to the plus sign. So it's an actual cash value. It's fair market value. Excuse me. It's reproduction costs minus depreciation. Depreciation equals reproduction costs minus fair market value. The math is, is, is indisputable. That is the way you figure it out. So the interview, then there's never any depreciation. No, no. I mean, there, there might be fair market. If we're using reproduction costs as a proxy for fair market value. No, no, no. I'm, this is not me talking. This is the ninth circuit talking. That's it. That's it. How'd you talk? Oh, I'm pointing the ninth circuit. And they said that it's fair market value. Excuse me. It's reproduction costs minus depreciation. We know what the reproduction cost is. 19.8. We don't know what the depreciation is. But if you just do the formula. Well, here's my problem. That's exactly what you argued the first time, sir. No, no. What you, what you said was, give me 19.8 because nothing should be subtracted from it. No, you're saying, I can move around the pieces a little bit, but give me 19.8 because nothing should be subtracted from it. Or minus a tiny bit. Well, that's the point. You know, let's go back and figure out what it is. What, what should we, in your view, should we remit for another trial on depreciation? Well, I prefer that than to say the judge was right because, because the judge was wrong. I think I made my point on that. I just wanted to make a couple of others. Maybe on that. Cause you said something that struck me and you said, which we doubt they will build, which we doubt they will build. Cause it's been so long. If your house burns down, uh, the charge of your house burns down, what you would expect the insurance company to pay you is like, I'll give you, uh, your fair market value for the house. Or you can rebuild it if you want.     they're going to say, well, you know what? I don't care. I don't care. I don't care. I don't care. I don't care. If you can't afford it. Because of this big depreciation. What are you going to do? You're going to rebuild it. Even though you don't want to buy a decision that this court makes that cuts the value of that dam in half. It said, we're going to give you, you can take $8 million in cash, or you could rebuild this thing for $30 million. What do you think they're going to do? They're going to rebuild it. Maybe that's not the right decision. So yeah, although when I ran the math, I don't pretend to be a mathematics teacher. If, if you got the recovery that the child took, the court thought you should get, which was $12 million something, and apply about 20 years of return to the interest to it. Yeah, a really good number of them. Yeah, yeah. By the way, you're, it seems to me you ought to, you ought to want us to approve the trial court and tone it up. Well. Because if we don't, you're going to go back again and you're going to be stuck with this one. I don't mind time on that, but I think you ought to have three judgment interests in it. I don't think you're going to be able to head again, but if we didn't get anything, how much we can give it all. All I'm saying is that, is that if you got, what the trial judge thought is plus minus depreciation, plus three judgment interests over time, uh, you're right at the number you wanted anyway. Thank you. Mr. Blatt, there was about four words about your cross-appeal, but you can respond to those four words, but not only about what was said about your cross-appeal. Okay. We normally don't have survey bubble. I'm sorry. I was limited to. I'm sorry. I was not going to be able to say that. Okay. You do have something to say, but you won't be able to say it. Well, you had your opportunity on the main appeal. Thank you. Thank you very much. The case just started. It is submitted, and we appreciate both counsel's arguments, uh, and your interest in this morning's session.
judges: Graber, Hurwitz, Foote